Joy KLINE, Personal Representative of the Estate of Jeffrey Kline, Deceased, Plaintiff/Counter–Defendant—Appellant,

v.

GULF INSURANCE COMPANY, Defendant/Counter–Plaintiff and Third Party Plaintiff—Appellee,

Cecil Hamlin, Third Party Defendant—Appellee.

No. 02–1978.

United States Court of Appeals, Sixth Circuit.

May 26, 2004.

David M. Dark, James, Dark & Brill, Kalamazoo, MI, for Plaintiff–Appellant.

James R. Case, Joanne G. Swanson, Kerr, Russell & Weber, Detroit, MI, for Defendant–Appellee.

Michael S. Bogren, Plunkett & Cooney, Kalamazoo, MI, for Appellee.

Cecil Hamlin, Sheldon, IL, pro se.

Before ROGERS and COOK, Circuit Judges; and BERTELSMAN, District Judge.*

ROGERS, Circuit Judge.

Joy Kline appeals from the district court's grant of summary judgment to Gulf Insurance Company ("Gulf") in this action arising out of the death of Kline's husband in an automobile accident. Kline contends that, in granting summary judgment to Gulf, the district court improperly resolved factual disputes and erred in interpreting various insurance policies. Because a genuine issue of material fact exists as to whether an MCS–90 endorsement was attached to the Gulf policy, we reverse the judgment of the district court.

On November 3, 1997, Kline's husband died as a result of injuries he sustained when the automobile he was driving was in a collision with a truck driven by Cecil Hamlin and owned by Builder's Transport, Inc. ("BIT"). At the time of the accident, BTI was an authorized self-insurer pursuant to 49 U.S.C. § 13906(d) and C.F.R. § 387.309. BTI also purchased two insurance policies, a primary policy through Reliance Insurance Company ("Reliance") and an umbrella policy through Gulf.

BTI filed for bankruptcy on May 21, 1998. Kline, the personal representative of her husband's estate, was granted limited relief from the United States Bankruptcy Court to bring a wrongful death action against BTI in state court. The parties agreed to settle this underlying action for $3.2 million. Kline sought writs of garnishment against both Reliance and Gulf.

Reliance filed a garnishment disclosure, indicating that it owed Appellant/Plaintiff $1 million, based upon its assertion that it covered BTI for $1 million over a $1 million loss-corridor deductible (deductible) and over a $1 million self-insured retention (SIR) provided for in the policy. Gulf filed a garnishment disclosure, indicating that it owed Kline $200,000.00, to cover the rest of the $3.2 million settlement beyond the coverage provided by Reliance. Both Reliance and Gulf paid these amounts plus statutory interest to Kline.

Gulf successfully removed the garnishment action to the United States District Court for the Western District of Michigan and filed a counterclaim for declaratory relief against Kline and a third-party claim

---

* The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

against Hamlin requesting a declaration regarding the extent of insurance coverage.[1] Kline filed an amended complaint that—in addition to seeking garnishment—included common law and statutory bad faith claims, a breach of contract claim, a Michigan Consumer Protection Act claim, a negligence claim, and a negligent performance of contract claim. Gulf and Kline filed motions for summary judgment and partial summary judgment respectively. The district court concluded that Gulf had satisfied its obligations under the umbrella policy, granted Gulf's motion for summary judgment, and denied Kline's motion for partial summary judgment.

Kline appeals the district court's grant of summary judgment in favor of Gulf on its counterclaim for declaratory judgment and on the garnishment, statutory bad faith, and breach of contract counts of her complaint.[2] She contends that, in granting summary judgment to Gulf, the district court erred in concluding that the Gulf umbrella policy had an attachment point of $3 million and that the court made an improper factual determination that a particular endorsement—an MCS–90[3]—was not a part of that policy. We agree with the district court's conclusion that the Gulf umbrella policy attached at $3 million, for the reasons set forth in the district court's May 1, 2002 opinion. However, we re-verse the district court's grant of summary judgment on Gulf's counterclaim seeking declaratory judgment that it had fulfilled its obligations under the insurance policy, because a genuine issue of material fact exists as to whether the Gulf policy included an MCS–90 endorsement. Further, we remand Kline's claims for garnishment, statutory bad faith, and breach of contract because, in disposing of the claims, the district court relied, at least in part, on its conclusion that the Gulf policy did not include an MCS–90 endorsement.

A district court's decision to grant summary judgment is subject to *de novo* review. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 521 (6th Cir.1997). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact remains in dispute. *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The moving party does not, however, need to produce evidence showing the absence of a genuine issue of material fact. Instead, "the burden on the moving party may be discharged by 'showing'—that is, pointing

---

1. Kline also sought a writ of garnishment against Reliance in state court, and that action was also removed to the Western District of Michigan. That case was stayed in July of 2001, as Reliance was placed in a rehabilitation proceeding by the Pennsylvania Insurance Commissioner.

2. Kline has not argued on appeal that the district court erred in granting summary judgment on her other claims.

3. Federal regulations provide that "authorized carriers"—such as BTI—"must maintain insurance or other form of surety 'condi-tioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles' under the carriers license." *Prestige Cas. Co. v. Mich. Mutual Ins. Co.*, 99 F.3d 1340, 1343 (6th Cir.1996) (quoting 49 C.F.R. § 1043.1(a)(1995)). Carriers may meet this requirement in a number of ways: by submitting a MCS–90 endorsement, by submitting a surety bond issued by a surety, or by obtaining written authorization from the ICC to self-insure. 49 C.F.R. § 387.7(d) (1995).

out to the [ ] court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the summary judgment phase, the facts, as well as any inferences that can be drawn from them, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether a factual issue is genuine for the purposes of summary judgment in most civil cases, a court must decide "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Federal regulations require certain motor carriers, including BTI, to obtain an MCS–90 endorsement, unless the carrier is an authorized self-insurer. An MCS–90 is a form endorsement to be included in an authorized carrier's insurance policy. The endorsement provides, in relevant part,

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980.... *It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of the policy herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.*

49 C.F.R. § 387.15 (1995) (emphasis added).

In concluding that reasonable jurors could not find that the Gulf policy included an MCS–90 endorsement, the district court observed that it was "far-fetched" or "unlikely" that BTI would obtain such coverage given that it was an authorized self-insurer and thus was not required to obtain an MCS–90. It is not disputed, however, that the insurance policies purchased by BTI for the two previous policy years included MCS–90 endorsements, and there is some indication that other motor carriers sometimes purchase policies that include MCS–90 endorsements even though they are authorized self-insurers. *See Madere v. Nat'l Union Fire Ins. Co.,* No. CIV. A. 98–3247, 2000 WL 1593441, at *1 (D.La. Oct. 24, 2000) (noting that company was certified as self-insurer under Interstate Commerce Commission regulations, but had also purchased insurance policy with MCS–90 endorsement).

The district court also found that there was no evidence that a *countersigned* MCS–90 endorsement was delivered to BTI or its brokers. First, although the district court indicated that, under the terms of the MCS–90 endorsement, a countersignature was required in order for the endorsement to be valid, that conclusion appears to be mistaken. While the form MCS–90 does include a countersignature line, nothing in the endorsement or the underlying regulation specifies that the endorsement is not valid without a countersignature. *See* 49 C.F.R. 387.15. Kline argues—and Gulf has not disputed—that the countersignature line merely allows a countersignature where required by the terms of the policy and that the Gulf policy

does not require that individual endorsements be countersigned.

Second, Kline has adduced evidence sufficient to permit a reasonable juror to conclude that the copy of the policy delivered to BTI's broker included an MCS–90 endorsement. Correspondence concerning the policy at issue between Gulf and its reinsurer contemplated that the BTI insurance policy for 1997—like the policies for 1995 and 1996—would include an MCS–90 endorsement. *See* J.A. at 1023–25. The two insurance quotes sent to BTI in the record included an MCS–90 in the list of policy endorsements, and the premium paid by BTI for the 1997 policy matched the policy premium set forth in the second quote. J.A. at 1029–30; 1032–33; 1034. Gulf confirmed to BTI (through BTI's broker) in a renewal binder that BTI's 1997 policy was issued "on same terms and conditions as [the] expiring [policy]." J.A. at 1034. On July 9, 1997, Gulf sent copies of the policy to its reinsurer and to BTI's broker. Gulf's re-insurer's records indicate that the policy it received included an MCS–90 endorsement.[4] J.A. at 1093. While the endorsement bore the same date as the policy cover letter and the new policy number for 1997, the effective date was listed as June 1, 1996. *Id.* Gulf subsequently sent both BTI's broker and its reinsurer letters purporting to contain revised MCS–90 endorsements for the 1997 policy. J.A. at 1057–58. While nei-

ther BTI's broker nor the reinsurer could produce the revised endorsements that the letters indicated were attached, Gulf's own file—in the portion of the file dedicated to the issued policy—contained a countersigned MCS–90. Although that copy of the endorsement was also dated July 9, 1997, it indicated that the effective date was June 1, 1997. J.A. at 561.[5] Taken together (in the light most favorable to Kline), these facts would permit a reasonable juror to conclude that the copy of the 1997 Gulf policy delivered to BTI through its broker included an MCS–90 endorsement.

Gulf urges that, even assuming its policy did include an MCS–90 endorsement, it would still be entitled to summary judgment because (1) the MCS–90 was not filed with the Department of Transportation, (2) no payment is due under the MCS–90 because Kline has already received more than the $1 million—the maximum required security limit under the regulations, and (3) an MCS–90 endorsement is triggered only when no other policy provides coverage.

First, Gulf cites no authority for its contention that parties cannot negotiate for the coverage provided by MCS–90 endorsements even where such coverage is not required by law, or that the failure of such parties to submit the endorsements to the government vitiates any coverage so provided. While we have found no case

---

**4.** BTI's broker was unable to produce records for the policy at issue because the records were destroyed during the destruction of the World Trade Center. Copies of the relevant correspondence were kept, however, by Gulf and Gulf's reinsurer. Given that the letters from Gulf to its reinsurer and BTI's broker were prepared on the same day by the same person, and purported to enclose the same policy, a reasonable juror could conclude that the policy received by BTI's broker was the same as the policy sent to Gulf's reinsurer. *Compare* J.A. at 1047 *with* J.A. at 1092.

**5.** Given the correspondence between the parties, a reasonable juror could conclude that the countersigned MCS–90 found in Gulf's files was the "revised" MCS–90 that Gulf purportedly forwarded to both BTI's broker and its reinsurer. Accordingly, summary judgment would not be appropriate even if the MCS–90 endorsement required a countersignature.

law on point, it appears, as noted above, that BTI and other authorized self-insurers have in the past negotiated for and purchased such coverage. Accordingly, the effect of statutory requirements and limits in such cases is unclear.

Second, Gulf's argument that the MCS–90 endorsement is not triggered because both it and Reliance provided some, albeit inadequate, coverage is not supported by the case law. Gulf relies on two cases, *Canal Insurance Co. v. Carolina Casualty Insurance Co.*, 59 F.3d 281 (1st Cir.1995) and *T.H.E. Insurance Co. v. Larsen Intermodal Services*, 242 F.3d 667 (5th Cir. 2001). *Canal* is inapposite as it involved a dispute between two insurance carriers rather than a claim by an injured member of the public and, in any event, the court found that the insurer whose policy included an MCS–90 endorsement was required to pay the difference between the settlement amount and the amount found to be covered by other insurance. 59 F.3d at 283. In *T.H.E. Insurance*, although the court made some contradictory statements about when coverage under the MCS–90 was triggered, those statements were dicta inasmuch as the issue before the court was whether an insurer could recover from its insured payments paid pursuant to an MCS–90 endorsement for an accident that was not otherwise covered by the terms of the policy. 242 F.3d at 670.

Finally, the effect of the attachment of an MCS–90 endorsement to an umbrella

policy is a difficult issue we decline to reach where the district court has not ruled on the issue and where there is a factual dispute about whether the policy in question included such an endorsement. The cases relied on by Kline provide little clarification on the effect of the MCS–90 endorsement purportedly attached to the Gulf policy, inasmuch as they consider the effect of MCS–90 endorsements on the apportionment of liability among insurance companies, rather than whether an MCS–90 endorsement requires an insurance company to drop below the attachment point of an umbrella policy. Although the cases do contain language indicating that an MCS–90 operates to negate limiting clauses in the policy to which it is attached, *see Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340, 1349 (6th Cir.1996); *Empire Fire & Marine Ins. Co. v. Guar. Nat'l Ins. Co.*, 868 F.2d 357, 363 (10th Cir.1989); *Carolina Cas. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 312 (5th Cir. 1978); *Zurich–Am. Ins. Co. v. Amerisure Ins. Co.*, 215 Mich.App. 526, 547 N.W.2d 52, 58 (1996), those cases involve limiting clauses that are fundamentally different than the Gulf policy's attachment point.

In those four cases, the issue was how to apportion a loss among insurers that issued policies providing primary coverage, although, insofar as the particular accident involved, at least one insurer asserted that its coverage was secondary or excess.[6]

---

**6.** Other cases consider the effect of MCS–90 endorsements attached to primary insurance policies where the vehicles at issue were not listed as covered vehicles under the policy. *See T.H.E. Ins. Co. v. Larsen Intermodal*, 242 F.3d 667, 670 (5th Cir.2001) (insured had failed to request coverage for tractor within twenty-four hours of acquisition, as required by policy); *Canal v. Carolina Cas. Co.*, 59 F.3d 281, 283 (1st Cir.1995) (truck was not covered under policy due to insured's failure to notify insurer within thirty days of acquisition); *Canal Ins. Co. v. First Gen'l Ins. Co.*,

889 F.2d 604 (5th Cir.1989), *modified on other grounds*, 901 F.2d 45 (5th Cir.1990) (policy covering specifically described tractors did not cover tractor not named in policy). In those cases, the courts found that although the MCS–90 rendered the insurer liable to injured members of the public, the MCS–90 insurer might be entitled to recoup all or part of the money paid from the insured or other insurers. *See T.H.E.*, 242 F.3d at 673–74; *Carolina Cas.*, 59 F.3d at 283; *First Gen'l*, 889 F.2d at 609–10. This result is unsurprising,

For example, in *Prestige*, insurance policies issued by two insurers on their face covered the judgment at issue. 99 F.3d at 1345. Both policies, however, also had identical "excess" insurance provisions, which purported to require that the other policy be exhausted first. Accordingly, the court was required to apportion liability between the insurers. In doing so, the court considered the effect of an MCS–90 attached to one of the policies. The court concluded that the MCS–90 negated the "excess" provision of the policy, because the endorsement "deletes limiting clauses in the policy to which it is attached, but it does not create new, additional obligations in the policy...." *Id.* at 1349 (quoting *Zurich–Am. Ins. Co. v. Amerisure Ins. Co.*, 215 Mich.App. 526, 547 N.W.2d 52, 58 (1996)). Unlike a primary insurance policy that contains an "excess clause," the Gulf umbrella policy does not, on its face, cover Kline's $3.2 million judgment. Consequently, case law provides little guidance concerning whether an MCS–90 endorsement should similarly negate the provisions of the Gulf umbrella policy providing that Gulf provides no coverage until all underlying insurance has been exhausted.

Accordingly, we REVERSE the district court's grant of summary judgment to Gulf and remand the case for further proceedings consistent with this opinion.

---

given that the express terms of the MCS–90 endorsement obligates insurers to pay such judgments "whether or not each motor vehicle is specifically described in the policy...."

49 C.F.R. § 387.15 (1995). The holdings do not address the effect of an MCS–90 on umbrella coverage where the primary insurer has paid up to its limit.